IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SOUNTHONE VIET KATEKEO,

    Petitioner,

vs.

T. FELKER, et al.,

    Respondents.

No. CIV S-08-2776 JAM GGH P

FINDINGS AND RECOMMENDATIONS

/

I. <u>Introduction</u>

    Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2006 conviction for attempted murder (Cal. Penal Code §§ 184, 187(a)), discharging a firearm at an occupied motor vehicle (Cal. Penal Code § 246) and a special firearm allegation (Cal. Penal Code § 12022.53(d)) (personal discharge of a firearm causing great bodily injury during the commission of an offense).

    Petitioner is serving a sentence of life with the possibility of parole plus a consecutive 25 years to life sentence. In particular, petitioner was sentenced to life with the possibility of parole for attempted murder and to a consecutive term of 25 years to life for the firearm enhancement. Petitioner's sentence for discharging a firearm at an occupied motor

vehicle (5 years plus 25 years to life for the enhancement) was stayed.

This action is proceeding on the original petition filed November 12, 2008, raising the following claims: 1) the trial court improperly denied petitioner's motion to substitute counsel; 2) the trial court improperly denied trial counsel's motion for a continuance; and 3) the trial court erred in admitting gang evidence.

After carefully reviewing the record, the court recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

2

1 Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

/////

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

III. Factual Background

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds the summary to be accurate and adopts it below.

FACTUAL AND PROCEDURAL BACKGROUND

The August 2004 Fight

One evening in August 2004, N.X. (the victim) was hanging out with his friend, S.T., at S.T.'s house on Las Palmas Avenue. They heard a loud commotion and went outside to investigate. A group of people, including the defendant, stood in the street. S.T. approached the group and defendant pushed him. When the victim intervened, the defendant pushed him as well. Defendant and the victim "square[d] off" and began to fight. The victim soon gained the upper hand, and one of defendant's friends jumped in and started fighting with S.T. Soon, "everybody started jumping in" to the fight, including defendant's girlfriend, J.M. When the crowd picked up bottles and pieces of wood to use as weapons, the victim and S.T. ran back into the house. Someone in the crowd threw a piece of wood through one of the windows. The police were called but never responded. The victim did not report the incident to police for fear of retaliation.

The September 2004 Shooting

In September 2004, the victim, S.T. and a friend went to Family Billiards to play pool. Defendant and three other men drove up in front of the pool hall. When defendant walked inside the pool hall, the victim and S.T. went outside to talk with defendant's friends to "try to resolve [the] problem." Defendant returned to the car and suggested they take it somewhere else. Defendant and his friends drove to the corner and the victim and S.T. followed on foot. Once there, defendant got out of the car, pulled out a handgun and started shooting. One of the shots grazed the victim's ankle. The victim and S.T. ran back inside the pool hall and defendant and his friends drove away. The victim did not call the police because he did not want to create "a bigger problem."

The December 16, 2004 Shooting

At approximately 6:00 p.m. on December 16, 2004, the victim was home playing video games with his little brother, P. P. left the house to go visit some friends down the street, but returned momentarily, telling the victim the defendant was outside. Not wanting the defendant to know where he lived, the victim stayed inside and continued playing video games. P. walked down the street and hung

out with defendant's younger brother and another friend, for several hours until the defendant came and picked his brother up around 7:00 or 8:00 p.m.

That same evening, the victim went over to S.T.'s house to watch a basketball game. He brought some beer with him, which he and S.T. decided to drink in the car parked out in front of the house because S.T.'s father did not approve of drinking in the house.

The two men sat in the car and drank a couple of beers while they talked and checked the basketball score on the victim's cell phone. After about 10 minutes, S.T. went back inside the house to change into some warmer clothes. A moment later, defendant walked up to the driver's side window and fired five or six shots into the car, hitting the victim in the chest, arm and back. S.T. and his brother heard the gunshots and the sound of the victim moaning. S.T. called 911 while his younger brother ran out to help the victim until help arrived. The victim was taken to the hospital where he remained for over two months. FN3 Police conducted a videotaped interview at the victim's hospital bedside during which the victim identified defendant as the person who shot him.

> [FN3. As a result of the shooting, the victim is now a paraplegic.]

Defendant was arrested and charged by amended information with attempted murder (Count One), discharge of a firearm at an occupied motor vehicle (Count Two), and two counts of assault with a deadly weapon (Counts Three and Four). FN4 The information specially alleged personal use and personal discharge of a firearm during commission of Count One, personal discharge of a firearm during commission of Count Two, and personal use of a firearm during the commission of Counts Three and Four.

> [FN4. Counts Three and Four related to the September 2004 shooting incident at the pool hall.]

Prior to commencement of trial, the prosecution filed a motion in limine seeking to admit evidence of defendant's gang affiliation to prove motive and to impeach alibi testimony from defendant's girlfriend. The court's ruling precluded evidence of gang affiliation under Evidence Code section 352, but noted the issue might need to be revisited at a later time.

At trial, the victim identified defendant as the shooter with "100 percent" certainty.

During trial, the court revisited the issue of eliciting testimony regarding defendant's gang affiliation from defendant's girlfriend, J.M., for the purpose of impeaching her with prior inconsistent statements. Despite its earlier ruling, the court concluded over defendant's objection that the prosecution would be allowed to ask J.M. questions pertaining to defendant's status as a gang member in order to impeach her testimony, and that an appropriate limiting instruction would be given.

On direct examination, J.M. testified that she and defendant were home on the morning of December 16, 2004, until defendant took her to work. She said he

picked her up from work at 2:00 p.m. and drove her to his mother's house to have something to eat. Sometime that afternoon, defendant and J.M. brought papaya salad from a neighbor, dropped defendant's two younger brothers off down the street, and went to visit defendant's friend (a mechanic), to have him look at J.M.'s van FN5 J.M. and defendant drove back home to North Highlands (a 30- to 40-minute drive), arriving there at approximately 6:00 or 6:30 p.m. They ate in and watched a movie and remained home the rest of the night.

[FN5. The mechanic's house is located next door to the victim's house.]

On cross-examination, J.M. was questioned about inconsistencies between her trial testimony and prior statements she had given to police, including statements regarding defendant's gang affiliation. At defense counsel's request, the court gave a limiting instruction regarding use of J.M.'s testimony related to defendant's alleged gang affiliation.

The jury found defendant guilty of attempted murder and discharge of a firearm into an occupied vehicle, and found the related special allegations to be true. The court declared a mistrial on the remaining charges.

At the sentencing hearing one month later, defense counsel requested a continuance, telling the court he had recently obtained information, and conducted some investigation, regarding the "real shooter" (a person named A.P.) and a possible percipient witness (a person named P.S.), and needed additional time to conduct further investigation in that regard. The court considered the information "sketchy and [ ] uncorroborated," and denied the request.

Prior to imposition of sentence, defendant read a statement to the court which set forth various complaints regarding the adequacy of his legal representation at trial. Characterizing those complaints as a Marsden request, the court conducted an in camera Marsden hearing and thereafter denied the motion.

The court sentenced defendant to an aggregate prison sentence of life with the possibility of parole plus 25 years to life, and imposed various fees and fines. The People dismissed Counts Three and Four in the interest of justice.

Defendant was granted relief from untimely filing of his notice of appeal.

People v. S.K., No. Co53622, 2008 WL 544306, at *1-*3 (Feb. 29, 2008).

Petitioner had also been charged with two counts of assault with a firearm regarding the September 18, 2004, shooting incident (counts 3 and 4). CT at 122-123. The jury could not reach verdicts as to these counts. RT at 648. The jury was deadlocked 11 to 1 for convicting. RT at 657.

/////

/////

6

1  IV.  Discussion

2         A.  Claim One

Petitioner argues that the trial court improperly denied his motion to substitute counsel. Petitioner contends that the record clearly demonstrated that counsel was not providing effective assistance. The opinion of the California Court of Appeal denied petitioner's related state law claim:

> Defendant first contends the trial court denied his Marsden motion on improper grounds and failed to conduct an adequate inquiry into his complaints concerning his counsel. We disagree.
>
> When a defendant seeks to discharge his court-appointed counsel on the basis of inadequate representation, the court must allow defendant to explain the basis of his claim and to relate specific instances of counsel's inadequate representation. (People v. Smith (2003) 30 Cal.4th 581, 604.) "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (People v. Jones (2003) 29 Cal.4th 1229, 1244-1245 ( Jones ).)
>
> We review the trial court's decision denying defendant's Marsden motion under the deferential abuse of discretion standard. (Jones, supra, 29 Cal.4th 1229, 1245.) " 'Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' [Citations.]" ( People v. Hart (1999) 20 Cal.4th 546, 603.)
>
> Defendant claimed his trial counsel, Joel Deckler, (1) failed to investigate information provided by defendant regarding the real perpetrator and a possible witness present when the shooting occurred, (2) failed to file a motion pursuant sections 1181 and 1182, and (3) failed to question witnesses in the manner suggested by defendant.
>
> The court offered Deckler the opportunity to respond. With regard to investigation into the alleged shooter, Deckler submitted the matter based on his prior representations to the court that (1) he had been given information regarding the identity of the "real shooter" (an individual who was then in custody on another matter) and contacted that individual's legal counsel but, due to the fact that the other case was pending, he was denied permission to interview that potential suspect, and (2) he had also been given the name of a possible witness who was with the "real shooter" at the time of the shooting, but his investigator's contact with that individual that very morning had "not panned out."
>
> With regard to filing a motion pursuant to section 1181, Deckler explained that a motion "to dismiss" FN6 would have been "superfluous" given the abundance of evidence against the defendant. Deckler went on to describe his lengthy record as

7

a criminal trial attorney, having tried over 200 felony cases to verdict with several acquittals in Three Strike cases, and concluded that he "did a masterly job in this case." Deckler also noted that the jury deliberated much longer than one would have expected considering that "the case was so overwhelming against [the defendant] in terms of proof beyond a reasonable doubt."

> [FN6. Attorney Deckler evidently mistook section 1181 (motion for new trial) for section 1118.1 (motion for judgment of acquittal).]

The court agreed Deckler was a very experienced lawyer who did a very good job for the defendant, particularly in light of the jury's inability to reach a unanimous verdict on two of the four counts. The court concluded that, despite defendant's disagreement with Deckler regarding strategy, and "given all the other facts and circumstances," defendant "got excellent representation," denying the motion as untimely.

We conclude there is no Marsden error. The trial court gave defendant a full opportunity to specify his concerns, and elicited an explanation from Deckler in response to those concerns. With regard to matters that took place in the courtroom, the court was able to observe Deckler's performance during the trial and we therefore defer to its assessment of his performance, absent contrary evidence. ( People v. Diaz (1992) 3 Cal.4th 495, 574.) To the extent there was a question regarding the efforts taken by Deckler outside the courtroom to investigate the "real shooter" and the percipient witness, the court was entitled to accept counsel's explanation of his conduct and was not obliged to inquire into the actual efficacy of his efforts. (People v. Smith (1993) 6 Cal.4th 684, 696-697; People v. Webster (1991) 54 Cal.3d 411, 435-436.) Finally, defendant's complaint regarding questioning of trial witnesses relates to trial tactics and strategy and does not constitute the type of "irreconcilable conflict" that indicates counsel's representation has become inadequate. (People v. Welch (1999) 20 Cal.4th 701, 728-729.)

Defendant argues the trial court improperly denied the motion on the ground that it was untimely. We disagree. While the court noted the motion was "untimely," the record also clearly reflects that it conducted a full Marsden hearing and elicited all of defendant's complaints and Deckler's responses thereto. The record also reflects that the court fully considered the information presented at the hearing, as well as "all the other facts and circumstances," in making its final determination.

Defendant also argues his counsel confused section 1181 with 1118 .1 and failed to bring a motion for new trial based on "ineffective assistance of counsel" arising out of the failure to investigate the "real shooter" and the percipient witness. However, as we have previously discussed in this opinion, counsel adequately explained his efforts to explore both leads, to no avail. FN7 Any confusion on counsel's part regarding a motion for new trial versus a motion for acquittal was therefore harmless.

> [FN7. Defense counsel did not just "try" to contact the witness, as defendant suggests on appeal; his representation to the court was as follows: "My investigator, Mr. Martinez, contacted Mr. S[.] this morning,

8

| | |
|---|---|
| 1 | and that has not panned out." (Emphasis added.)] |
| 2 | We conclude the court did not abuse its discretion in denying defendant's <u>Marsden</u> |
| 3 | motion. |

<u>Id.</u> at 3-5.

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. <u>Bland v. California Dep't of Corrections</u>, 20 F.3d 1469, 1475 (9th Cir.1994), overruled on other grounds by <u>Schell v. Witek</u>, 218 F.3d 1017 (9th Cir.2000) (en banc). The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. <u>Id</u>. at 1475-76.

Regardless of whether the state court failed to rule on the motion to substitute counsel or denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. <u>See</u> <u>Schell</u>, 218 F.3d at 1026. That is, the habeas court considers whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." <u>Id</u>. at 1026. Generally, the denial of, or failure to rule on, a motion to substitute counsel should be analyzed as a non-structural constitutional error, i.e., the harmless error standard. <u>Id</u>. at 1027-28.

At the outset, the court observes that petitioner's motion for substitute counsel was made at the sentencing hearing. RT at 672. The timing of the motion suggests that it may have been more motivated by disappointment with the verdict than actual dissatisfaction with counsel.

After independently reviewing the transcript from the <u>Marsden</u> hearing, <u>see</u> respondent's lodged document no. 1, the court finds that the trial court made a thorough

inquiry into petitioner's dissatisfaction with his trial counsel. The trial court allowed petitioner to explain the reasons for his dissatisfaction and then asked trial counsel to respond. No additional inquiry was warranted.

For the reasons stated by the California Court of Appeal, this court finds that the trial court properly denied petitioner's motion for substitution of counsel. Counsel adequately investigated the "real shooter." At the sentencing hearing, just before petitioner made his motion for substitute counsel, trial counsel made a motion to continue sentencing (the subject of claim two of the instant petition) so that he could investigate the "real shooter." RT at 663-664. Counsel admitted that his investigator had contacted this person but that it had not "panned out." RT at 664. In addition, this court agrees with the state appellate court that any confusion on counsel's part regarding a new trial motion versus a motion for acquittal was harmless.

Petitioner's relationship with his counsel had not become so great that it resulted in a total lack of communication or other significant impediment that resulted in an attorney-client relationship that fell short of that required by the Sixth Amendment. The trial court properly denied the motion for substitute counsel.[1]

No state court issued a reasoned opinion addressing the merits of petitioner's constitutional claim. Accordingly, after conducting an independent AEDPA review, the court finds that the denial of this claim by the state courts was not an unreasonable application of clearly established Supreme Court authority.

B. Claim Two

Petitioner contends that the trial court violated his right to due process by denying counsel's motion for a continuance. The California Court of Appeal denied this claim as follows:

---

[1] In his state appeal, petitioner argued that the trial court improperly denied his Marsden motion as untimely. Petitioner has apparently abandoned this argument in his federal habeas petition. In any event, the court indicates that the trial court did not deny the motion as untimely.

10

> Defendant contends the trial court violated his right to due process of law when it refused to grant a continuance to permit Deckler to further investigate information regarding the "real shooter" and a possible witness with personal knowledge about the shooting. We disagree.
>
> " 'The granting or denial of a motion for continuance rests within the sound discretion of the trial court.' " (People v. Michaels (2002) 28 Cal.4th 486, 525, quoting People v. Mickey (1991) 54 Cal.3d 612, 660.) " 'A motion for continuance should be granted only on a showing of good cause. (§ 1050, subd. (e).)' [Citation.] ... The standard of review for a trial court's denial of a continuance motion is abuse of discretion. [Citation.]" (People v. Wilson (2005) 36 Cal.4th 309, 352.) "An important factor for a trial court to consider is whether a continuance would be useful. [Citation.] ... [T]o demonstrate the usefulness of a continuance a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (People v. Beeler (1995) 9 Cal.4th 953, 1003.)
>
> Defense counsel requested a continuance at the sentencing hearing on May 12, 2006. He informed the court that he "was given information" about the "real shooter" and, on May 2, 2006, "as soon as [he] obtained the information," he contacted the public defender's office to try to obtain the suspect's statement. He was informed the following day that the suspect "had a pending case and there was no permission to talk to him [the suspect]." Counsel also informed the court that the defense investigator's contact with the alleged witness had "not panned out." We infer from those statements that additional efforts to obtain access to the alleged shooter during the pendency of the case against him would be fruitless, and further contact with the potential witness would not likely produce information helpful to defendant's case since the initial contact did not "pan[ ] out." We find no error in the court's denial of the motion for lack of good cause.

2008 WL 544306 at *5.

Trial courts are accorded broad discretion on matters regarding continuances. See Morris v. Slappy, 461 U.S. 1, 11-12, 103 S. Ct. 1610 (1983). However, there are cases holding that a trial court's failure to grant a defendant a continuance may violate a defendant's right to due process or other constitutional rights. See, e.g., Armant v. Marquez, 772 F.2d 552, 556-58 (9th Cir.1985) (Sixth Amendment right to self-representation).

Whatever the basis of the challenge, the denial of a continuance is reviewed for abuse of discretion. See Morris, 461 U.S. at 11-12, 103 U.S. 1610 ("only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' " violates a defendant's rights); Armant, 772 F.2d at 556. In Armant, the Ninth Circuit recited the four factors used to determine whether the trial court abused its discretion in denying a requested

11

continuance: (1) the degree of diligence by the petitioner prior to seeking the continuance; (2) whether the continuance would have served a useful purpose; (3) whether the continuance would have inconvenienced the court or the prosecution; and (4) the amount of prejudice suffered by the petitioner. Id. at 556-57; see also, e.g., Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir.1997).

In the instant case, it is hard to determine the degree of petitioner's diligence prior to seeking the continuance. At the sentencing hearing, trial counsel stated that he was given information that the real shooter was someone else, although he does not state when. RT at 663. He states that on May 2, 2006, he asked the Public Defender's Office for permission to contact the shooter. Id. The court cannot determine the degree of diligence from this information.

It is clear that the continuance would not have served a useful purpose. At the sentencing hearing, as discussed above, counsel stated that his investigator had contacted the person alleged to have been the real shooter but it had not panned out. RT at 664. Based on this representation, granting a continuance would have served no useful purpose. Because the motion was made at the sentencing hearing, it is unlikely that granting it would have significantly inconvenienced the court or the prosecution. As for the final factor, petitioner was not prejudiced by the denial of the motion for a continuance because there was no evidence that the other person was the real shooter. Moreover, in this habeas proceeding, and understanding that petitioner has now had years to think about it, much less a short continuance, petitioner was free to develop a claim of actual innocence to finally reveal proof of who the "real shooter" was; yet this critical fact remains completely undeveloped – and apparently undevelopable – years after the attempted murder.

Weighing the factors discussed above, the court finds that the trial court's denial of petitioner's motion for a continuance was not an abuse of discretion.

The denial of this claim by the California Court of Appeal, the last state court to issue a reasoned opinion addressing this claim, was not an unreasonable application of clearly

established Supreme Court authority. Accordingly, the court recommends that this claim be denied.

### C. Claim Three

Petitioner alleges that the admission of gang affiliation evidence violated his right to due process. Prior to trial, the court ruled that "gang" evidence was inadmissible because under Cal. Evid. Code § 352, its prejudicial effect outweighed its probative value. RT at 71-72. In making this ruling, the court stated that it would not surprise him if the evidence came in so that the issue may have to be revisited. RT at 72.

During trial, the court changed its ruling and permitted the prosecutor to impeach Julie Mounlavongsy, petitioner's girlfriend, regarding inconsistent statements she had made to officers concerning petitioner's gang membership. RT at 424. The prosecutor went on to question Ms. Mounlavongy regarding her prior inconsistent statements regarding petitioner's gang membership. RT at 485-488. Following this testimony, the trial court gave the following instruction:

> Ladies and gentlemen, what Im talking about with counsel is that as you've been listening here, there's been testimony elicited that appears to show that the defendant–the witness, may have made inconsistent statements to the police officers at various times during their investigation.
>
> And in the process of eliciting that kind of testimony here this afternoon, there were questions asked of the witness regarding the defendant's membership in LGC gang. And I allowed those questions to be asked for the sole purpose of allowing the People to attempt to impeach the witnesses's credibility by showing that she made, among other inconsistent statements about that topic as well, in addition to some of the others that you've heard Mr. Thinh ask her about.
>
> So what I'm telling you then is that that was the sole purpose of me allowing that line of questioning. You are not to draw any conclusion from any of the questions that the district attorney asked to the extent that–or you are not to conclude that the defendant is in fact a member of any gang from those statements. They were offered just to show that in the process of the witness being interviewed by the police officers about this and other topics, she appeared to make different statements.

\\\\\

\\\\\

RT at 492-493.[2]

The California Court of Appeal addressed this claim as follows:

Defendant contends admission of evidence of his gang affiliation was prejudicial error requiring reversal of his conviction. We agree that admission of the evidence was error; however, we conclude the error was harmless.

Admission or exclusion of evidence offered for impeachment on a collateral matter is within the trial court's discretion. (People v. Douglas (1990) 50 Cal.3d 468, 509.) On appeal, we review the trial court's admission of gang affiliation evidence for abuse of discretion. (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125; see People v. Tran (1996) 47 Cal.App.4th 759, 771 [trial court's exercise of discretion under Evidence Code section 352 will not be reversed unless it " 'exceeds the bounds of reason, all of the circumstances being considered' "].)

"[A] party cannot 'elicit otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it.' " ( People v. Fritz (2007) 153 Cal.App.4th 949, citing People v. Lavergne (1971) 4 Cal.3d 735, 744.)

Here, defendant was not charged with any crime related to gang membership or activity. He did not testify at trial, nor did he raise the issue of his gang affiliation. It was the prosecution who introduced that evidence to impeach defendant's girlfriend and alibi witness, J.M., with prior inconsistent out-of-court statements she made to police. Those statements were wholly unrelated to the facts at issue at trial. Given that J.M.'s out-of-court statements related to a collateral matter (defendant's involvement with gangs), what little probative value they may have had was significantly outweighed by the prejudicial effect of evidence defendant was a gang member. Under these circumstances, we conclude the trial court's admission of the evidence was an abuse of discretion.

Defendant argues the error is prejudicial and, under Chapman v. California (1967) 386 U.S. 18, 23 [87 S.Ct. 824, 17 L.Ed.2d 705], is not harmless beyond a reasonable doubt because the evidence of his gang affiliation was "not probative of any disputed fact," the evidence in the case "was evenly balanced" and the trial court's limiting instruction was "confusing." In the alternative, defendant argues the court's prejudicial error requires reversal under People v. Watson (1956) 46 Cal.2d 818, 836 ( Watson ).

In assessing whether an Evidence Code section 352 ruling caused a miscarriage of justice, we apply the harmless error standard set forth in Watson. ( People v. Cunningham (2001) 25 Cal.4th 926, 998-999; People v. Cudjo (1993) 6 Cal.4th

---

[2] The trial judge got his main point across, i.e., that the jury was not to conclude from the evidence that petitioner was, in fact, a gang member. In so doing, however, he more or less told the jury that the witness had been inconsistent in her answers, an issue the jury was supposed to determine. No party raises such an issue, and the undersigned does not believe that the "secondary" instruction had much effect on a conclusion that was fairly obvious from the cross-examination.

14

585, 611.) In doing so, we conclude it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ( Watson, supra, 46 Cal.2d at p. 836.)

Contrary to defendant's assertion, the case against him was strong. Defendant attacked the victim on three separate occasions. The victim made a positive identification of defendant from his (the victim's) hospital bed, and identified defendant again with "100 percent" certainty at trial. There was no evidence the victim was "intoxicated" after having drunk two or three beers just prior to the shooting, as defendant claims, or that the victim's consumption of alcohol in any way impaired his ability to positively identify the defendant. Nor is it significant that the victim "neglected to tell the police the shooter wore a ball cap," given the uncontroverted facial identification.

Although defendant's girlfriend, J.M., provided an alibi for defendant, her credibility was questionable even in the absence of testimony regarding defendant's gang affiliation due to a number of other inconsistencies in her testimony regarding the events that occurred the day of the shooting, as well as the potential bias created by her close relationship with defendant.

Citing People v. Cardenas (1982) 31 Cal.3d 897, 914 ( Cardenas ), defendant argues the mere fact that he was portrayed as a gang member "ensured that the jury would reach a verdict based on improper evidence." We disagree. In Cardenas, the trial court not only admitted evidence of defendant's membership in a gang, but also allowed the prosecutor to make "broad inquiries suggesting that the gang was involved in criminal activities" and to present evidence concerning defendant's narcotics addiction, none of which was relevant to any issue before the jury. ( Id. at pp. 905-907.) Given the highly prejudicial effect of that cumulative evidence, and the fact that there was little evidence to prove that defendant perpetrated the charged crimes, the Court of Appeal concluded the error was so prejudicial as to require reversal of the defendant's conviction. ( Id. at pp. 907-910.)

We find the facts of Cardenas, supra, 31 Cal.3d 897, to be distinguishable and the case therefore unavailing. First, unlike Cardenas, the gang evidence admitted here amounted to testimony that defendant was a member of a gang, nothing more. There was no testimony describing the nature or characteristics of the gang or its members, nor was there testimony to suggest the gang was involved in criminal activity. Second, the trial court here gave the jury a limiting instruction explaining they were not to draw any conclusions as to whether or not defendant was, in fact, a member of a gang, and were only to consider J.M.'s testimony for purposes of judging her credibility. Finally, unlike Cardenas, the evidence against this defendant was significant.

We are satisfied from the record that even had the testimony regarding defendant's gang affiliation not been admitted, it is not reasonably probable that a verdict more favorable to defendant would have resulted. (Watson, supra, 46 Cal.2d at p. 836.)

2008 WL 544306 at * 6-*7.

15

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is unavailable for alleged error in the interpretation or application of state law. Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

The Supreme Court has reiterated the standards of review for a federal habeas court. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991). In Estelle v. McGuire, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief. The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 67-68, 112 S. Ct. at 480. The Court re-emphasized that "federal habeas corpus relief does not lie for error in state law." Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092, 3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts may not grant habeas relief where the sole ground presented involves a perceived error of state law, unless said error is so egregious as to amount to a violation of the Due Process or Equal Protection clauses of the Fourteenth Amendment).

The Supreme Court further noted that the standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480. The Court also stated that in order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73, 112 S. Ct. at 482. Habeas review does not lie in a claim that the state court erroneously allowed

or excluded particular evidence according to state evidentiary rules. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

For the reasons stated by the California Court of Appeal, the court finds that the admission of the gang evidence did not violate fundamental fairness. As noted by the state appellate court, the evidence against petitioner was strong so that evidence that petitioner was a gang member most likely did not impact the jury's verdict.

The conviction was supported by the testimony of both the victim and his friend, Chay, which the court will summarize below.

At trial the victim, Nattasin Xabandith, testified that he knew petitioner from school. RT at 89-90. Regarding the August 2004 incident, he testified that he was visiting his friend, Chay. RT at 93. At around 8 p.m, he and Chay went outside because there was a loud commotion in the street. RT at 94. He saw petitioner and a group of people arguing. RT at 94. Petitioner pushed Chay. RT at 95. The victim then went up to Chay to make sure he did not get jumped. RT at 98. Petitioner then pushed the victim. RT at 98. Petitioner's friends then said, "square off," which means get ready to fight. RT at 99. Petitioner and the victim fought for a few minutes. RT at 99. The victim won the fight. RT at 100. Petitioner and Chay began fighting, then everyone jumped in. RT at 100.

The victim testified that in September 2004, he and Chay went to Family Billiards. RT at 110. Petitioner and some friends pulled up in a green Acura Integra in front of the pool hall. RT at 110-111. The victim and Chay went outside. RT at 113. Petitioner had gone inside to use the restroom. RT at 113. When he returned, his friends told them to go talk about it some where else so it would not create a scene. RT at 114. The group then went to the corner of the pool hall parking lot. RT at 115. Petitioner then started shooting at the victim and Chay. RT at 115. One of the bullets grazed the victim's ankle. RT at 116. Chay and the victim then ran away. RT at 117. The victim could not remember how many shots were fired. RT at 117.

On cross-examination, the victim was questioned regarding his testimony at the preliminary hearing regarding the September incident. RT at 161. At the preliminary hearing, the victim had testified as follows:

> Question: You're saying that you saw him point the gun. Once you saw him point the gun, you didn't stick around.
>
> Answer: No.
>
> Question: So you didn't watch who and what he shot at.
>
> Answer: Right.

RT at 161.

The victim testified that on December 16, 2004, he was at home at around 6 p.m. playing video games. RT at 123. The victim's little brother, Peter, went outside. RT at 124. Some time later, Peter returned and told the victim that petitioner was outside. RT at 125. The victim stayed inside. RT at 124. Later that evening, the victim went to Chay's house. RT at 126. The victim and Chay sat in the victim's car and drank some beer. RT at 128. The victim had two beers. RT at 129. Chay then went inside to put on some warmer clothes. RT at 130. About a minute later, petitioner went up to the window of the car and shot the victim. RT at 130. Petitioner was wearing a dark sweater and a ball cap. RT at 132. The victim testified that he got a good look at petitioner. RT at 132. On cross-examination, petitioner was questioned regarding a previous statement given to police indicating that he could not remember if petitioner was wearing a baseball cap or not. RT at 171.

The victim's little brother, Peter, testified that on December 16, 2004, he saw petitioner and a girl sitting in a white van in front of his house. RT at 200. Peter later identified the girl as petitioner's girlfriend, Julie, after looking at a picture shown to him by a detective. RT at 207-208.

Chay testified regarding the August 2004 incident. His description of the incident was similar to the victim's description. RT at 223-230. Chay's description of the September

2004 incident was similar to the victim's description. RT at 232-235. Chay testified that after petitioner got out of the car, he started shooting. RT at 235. He testified that the shots were fired at him and the victim. RT at 237. He testified that he saw petitioner aiming the gun at them. RT at 237. Chay's testimony regarding the December 2004 incident was similar to that of the victim's. RT at 241-244.

In his defense, petitioner's girlfriend, Julie, testified that on the night of December 16, 2004, she and petitioner watched a movie then fell asleep. RT at 460. On cross-examination, she was questioned regarding different versions of the events of the day of December 16, 2004, she had given to different law enforcement officers.

Because the evidence against petitioner was strong, and his defense was weak, it is very unlikely that the improper admission of evidence regarding petitioner's gang membership had an impact on the jury's verdict. For this reason, the court finds that no violation of fundamental fairness occurred as a result of the improper admission of this evidence.

After conducting an AEDPA review, the court finds that the denial of this claim by the state courts was not an unreasonable application of clearly established Supreme Court authority.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

\\\\\

\\\\\

that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 03/25/09

/s/ Gregory G. Hollows
<u></u>
UNITED STATES MAGISTRATE JUDGE

kat2276.157